487 So.2d 660 (1986)
Ovidio S. FERNANDEZ
v.
MILLER RICHARDS AIRCRAFT SALES, INC., and R.E. Miller.
No. 85-CA-732.
Court of Appeal of Louisiana, Fifth Circuit.
April 14, 1986.
Rehearing Denied May 16, 1986.
Michael J. Domingue, Baton Rouge, for defendants-appellants.
Garon, Brener & McNeely, Milton E. Brener, Carol T. Richards, New Orleans, for plaintiff-appellee.
Before CHEHARDY, GAUDIN and DUFRESNE, JJ.
CHEHARDY, Judge.
Plaintiff, Ovidio S. Fernandez, filed this suit in redhibition against Miller Richards Aircraft Sales, Inc., a corporation doing business and domiciled in Springfield, Ohio, and R.E. Miller, individually and as a principal of Miller Richards, engaged in the business of selling used aircraft.
Plaintiff alleges that on or about October 19, 1983 he purchased a Piper aircraft "Cherokee 6" for the sum of $25,000 from the defendants. The aircraft was personally delivered to New Orleans by Mr. Miller. It is alleged that the aircraft was unfit for the purpose intended, was totally unreliable *661 and unsafe, and plaintiff would not have purchased the aircraft had he known of the defective condition of the engine.
While plaintiff alleges defects of the engine constituted a redhibitory defect, he does not offer to return the plane but requests instead a reduction in price equal to the cost of putting the engine in the condition it should have been at the time of the salein the sum of $19,749.83. He asks for additional itemized expenses of $4,302, for a total award of $25,306.83, plus interest, costs and attorney's fees.
Following trial on the merits judgment was rendered in favor of plaintiff against both defendants granting a reduction of price in the sum of $19,749.83, plus interest and costs. Defendants have appealed.
In this court appellants contend that R.E. Miller was not liable individually by reason of disclosed agency, and that Miller Richards Aircraft Sales, Inc., was not liable because of waiver of implied warranty.
Mr. Fernandez's version of the facts is as follows:
He is principally involved in the car repair business. He obtained a pilot's license in 1970 and holds a restricted commercial license. Plaintiff has done some crop dusting, but usually flies for himself and has owned several airplanes.
In 1983, plaintiff wanted to purchase a Piper Cherokee 6 so he could carry six passengers and accept freight business. He spoke with owners of that type of plane and started to look through aircraft flyers, newspaper and magazine ads. He was attracted to an ad in the Trade-A-Plane newspaper and called the phone number listed in the ad. He was referred to a second number and spoke with Mr. Miller about the condition of the plane at that number. Plaintiff claims he asked if Miller owned the plane, and Miller assured him that he did.
Arrangements were made for Mr. Miller to bring the plane to New Orleans so plaintiff could inspect it. It was brought to Moisant Airport on October 18 about 6 p.m. It was too dark for an inspection that evening so the following day both men went to the airport for a pre-flight check. They then flew to Columbia, Mississippi, for an inspection by Harold Cain, a mechanic selected by plaintiff. Plaintiff found Mr. Cain very competent and had received excellent service from him on other planes plaintiff had owned.
On the flight to Columbia plaintiff noticed various difficulties which he considered minor: the air conditioning was not working, nor was the DME (distance measuring equipment), and the right fuel tank had a small leak. Plaintiff was not concerned because the Cherokee airplanes had been notorious for those kind of problems. The items requiring repair did not seem to be of major expense compared to the overall price of the plane. Miller was asking $32,000 for the plane and it would sell new for $100,000.
Upon arrival in Mississippi, the log book of the plane was turned over to Mr. Cain. The maintenance tags were also examined. These show what company and what brand of parts were installed and who made the repairs.
The log book showed that the plane had been flown 250 to 260 hours from the last engine overhaul. As an engine needs a major overhaul after every 2000 hours, this would indicate a major overhaul would not again be necessary for at least another 1800 hours of flight time.
Mr. Cain, a helper and another mechanic proceeded to remove some of the panels of the plane and the engine column. They took out the spark plugs, checked for compression, removed panels in the rear section to look for rust and visually checked everything on the plane.
There was one major concern about the engine where a brown spot which looked like rubber had melted in one area, and a section in the rear of the plane where plaintiff was concerned about the type of primer material, indicating a possible accident.
There was oil everyplace over the engine and underneath the plane. Plaintiff claims Mr. Miller stated if he had known how bad *662 the oil leak was he would not have flown the plane to Louisiana.
Mr. Cain's inspection took three to three and a half hours. He found five items that needed correction: the air conditioning, the fuel tank, a trim tab, the oil leak in the engine, a strut was leaking and basically collapsed, and the DME was not working.
Cain's advice to plaintiff was to go ahead and purchase the plane. He estimated the cost of repairs for the five items would amount to $2,125.
With the cost of these repairs in mind plaintiff renegotiated the price. He planned to fly the plane back to New Orleans, but was unable to get it to start. This did not concern him because fuel injection airplanes, especially when they are hot, give problems when you try to start them. This is not an extraordinary occurrence and it happens often if you do not know how to restart it.
Cain's son flew plaintiff and Mr. Miller back to New Orleans. The men agreed upon a price of $25,000, subject to a $250 credit. The credit represents the amount plaintiff paid in advance to have Mr. Miller fly the plane to New Orleans for inspection with the understanding that if the plane was purchased that money would be refunded.
After arrival in New Orleans the two men drove to the bank in Baton Rouge which had agreed to finance the purchase. At that time Mr. Fernandez and Mr. Miller entered into a written contract for the purchase of the plane.
The bill of sale is a printed form labeled Aircraft Purchase Order. In large printed letters to the right of the order is the following logo:

The contract provides that the DMR will be shipped to Miller/Richards to be repaired and shipped back.
The guarantee is: Used as is; the purchase price is $25,000 (subject to the $250 cash payment as explained above).
Prominently displayed on the left front of the purchase order is the following:
 THE UNDERSIGNED PURCHASER AGREES THAT HE HAS
 READ AND UNDERSTANDS THE TERMS, CONDITIONS,
 WARRANTY AND LIMITATIONS OF LIABILITY SET OUT
 ON THE REVERSE SIDE HEREOF AND THAT THE SAME
 ARE INCLUDED IN AND ARE A PART OF THIS PURCHASE
 ORDER ALL AS IF SET FORTH ON THE FACE
 HEREOF.
 This agreement shall bind and inure to the benefit of the
 parties hereto and their executors, administrators, heirs
 and assigns.
 Purchaser hereby acknowledges receipt of a copy of this
 purchase order and that he has read and understands the
 terms, conditions and limitations of liability as set forth
 above.
 
 PURCHASER'S SIGNATURE
 
 SALESMAN'S SIGNATURE
On the reverse side of the purchase order the terms, conditions and warranties are set out with particularity. They provide that the purchase order, when accepted by the seller, becomes a binding contract of purchase and sale for the product. It also indicates the seller is not a manufacturer but only a distributor of aircraft products.
After the financing was concluded in Baton Rouge the men returned to New Orleans. *663 Miller returned to Ohio the following day. On that day Fernandez phoned Mr. Cain in Mississippi to tell him he had purchased the plane and authorized him to proceed with the repairs.
Several days later, Cain phoned plaintiff to tell him that after the engine had been opened more serious problems had been found. There were cracks in the case, some of the components were worn thin, they had scores and gouges and were in a deplorable condition. Cain explained that these were serious problems not discovered at the initial inspection. He was of the opinion that the plane had not had a major overhaul within the previous 250 to 260 hours, as indicated by the log book.
Cain estimated the cost of repair at $15,000 and plaintiff authorized him to proceed. The actual cost of repairs to the engine was $14,718.50. Cain also repaired the DME at an additional cost of $486.60 instead of sending it to Miller/Richards for repair, as per the contract. Plaintiff paid both bills.
Mr. Miller testified he is vice president of Miller Richards Aircraft Sales, Inc., an Ohio corporation. He denied he ever represented to plaintiff that he personally owned the plane. He claims he was unaware of the oil leak until he and Mr. Fernandez first found the leak. When it was discovered, he reduced the price of the plane from $32,000 to $27,500, and after Cain's inspection the price was further reduced to $25,000. Miller had no authority to sell the plane at a lower price.
He stated the ad was placed in the Trade-A-Plane newspaper by Mr. Richards, the president of the corporation, who was responsible for corporate advertising. The corporation has been in the business of selling used planes since 1974. It consists of Mr. Richards, Mr. Miller and their respective wives. They generally keep about 12 planes in stock and Miller had personally flown the plane in suit for about five hours prior to bringing it to New Orleans.
The ad consisted of a few lines describing the plane and a phone number to call for further information. No names were used in the ad, either personal or corporate. The phone number listed was that of the corporation and Miller claims the corporate phone is always answered as "Miller Richards."
As rebuttal plaintiff stated he first became aware he was dealing with a corporation at the time of purchase at the bank in Baton Rouge.
We consider the deposition of Harold Cain to be of primary importance. He is the aircraft mechanic who performed the pre-purchase inspection of the plane on behalf of plaintiff. He was accepted by both attorneys as an expert in aircraft mechanics. Cain testified in detail about the careful inspection of the plane and its log book.
At the time of his inspection he concluded the engine was of major concern because it had a bad oil leak and on top of the engine he noticed a sealant about 1 or 1½ feet long and 6 inches wide. The compression check was good but there was oil residue everywhere. He explained the casing would have to be split, resealed and put back together. He ascertained from the log book that it had been 250 hours since the engine had a major overhaul.
As a result of his detailed inspection, Cain told Fernandez and Miller that the plane was in good shape and if he were looking for an airplane himself he would buy it if he could afford it. He indicated the engine needed to be torn down to determine the problem and suggested to Fernandez that Miller should fly the plane back to Ohio to have it fixed if he (Fernandez) was interested in purchasing the plane.
Miller then indicated he would make a price adjustment, and after plaintiff and Miller had their discussion, plaintiff wanted Cain to make the repairs, but Miller was to have the DME repaired. He intended to take it back to Ohio with him but it was too big so he requested Cain to send it by UPS back to Miller Aviation for repair. Cain claims that in a further discussion Miller authorized him to send the DME for repairs to an avionic shop Cain uses in Alabama, but the contract for purchase indicates *664 the DME was to be sent to Miller/Richards in Ohio. After Fernandez returned to New Orleans, Cain stated he authorized him to make the repairs. When the engine was removed Cain discovered it needed extensive repairs, which he described in detail and which we have discussed in connection with plaintiff's testimony.
Cain immediately called the mechanic who did the prior overhaul. He ascertained who had made the earlier repairs by referring to the plane's log book. That mechanic told him the cylinders had been sent to a local school for repairs, rather than back to the manufacturer, because it was cheaper.
After the conversation Cain concluded the overhaul had not been properly done, but there is no evidence that the log book had been tampered with or that defendants had anything to do with the prior overhaul. In fact they did not own the airplane at that time.
The problem with the oil leak was that the crank case was cracked and Cain thought that the cracks may have been there at the time of the prior overhaul, but may have been overlooked.
Cain did not have the facilities to repair the engine, so he sent it back to Mack's Aircraft Engine Service, Inc., in Alabama, which performed the overhaul. Mack's billed Cain, who paid the bill, added his 25% and then billed Fernandez for the repairs.
Cain was of the opinion that if a new oil pump housing and gears had been put in at the previous overhaul they would not have been excessively worn and pitted. Therefore he concluded they had not been replaced and had been used more than 250 hours.
While plaintiff testified the repaired engine cannot be sold again and therefore has no core value, the expert witness stated it can be overhauled again. We therefore find the trial court reasons for judgment are erroneous in that respect. Cain stated the pitting probably occurred after the earlier overhaul.
When he opened up the engine Cain did not think it was safe for flying, but it was not close to engine failure. He concluded that whoever did the prior overhaul at 250 hours had done a shoddy job on the engine.
Cain stated that while flying the plane you would not have known something was wrong with the engine and it could not be determined that the plane was unairworthy until the engine was torn apart.
In this court appellant contends the trial court erred (1) in finding Mr. Miller personally liable, and (2) in disregarding the contract in which plaintiff waived his implied warranties.
Relative to appellant's first contention, in its reasons for judgment the trial court found Mr. Miller failed to disclose his agency relationship with the corporation either through the advertisement or in his dealings with plaintiff and that he held himself out to be the owner of the airplane.
To avoid personal liability to a third person an agent has the burden of proving that he contracted not individually but as an agent by disclosing his capacity and his principal's identity to the other party. LSA-C.C. arts. 3012, 3013; Meisel v. Natal Homes, Inc., 447 So.2d 511 (La.App. 4th Cir.1984); Duckworth-Woods Tire Ser. v. Smith & Johnson, 430 So.2d 207 (La.App. 4th Cir.1983); Ruckman v. Mashburn, 428 So.2d 531 (La.App. 4th Cir.1983).
Express notice of the agent's status and the principal's identity is unnecessary if the acts and circumstances surrounding the transaction demonstrate affirmatively that the third person should be charged with notice of the relationship. Meisel v. Natal Homes, Inc., supra.
Applying these principles to the instant case we conclude that Mr. Miller has successfully carried that burden. Significantly, when the pre-inspection was conducted at Cain's Aviation in Mississippi it was provided that the DME was to be shipped for repair to Miller/Richards. Even more significant is plaintiff's own testimony that he knew at the bank in Baton Rouge when he signed the purchase *665 agreement immediately prior to applying for the loan that he was dealing with a corporation. Miller signed the contract as "salesman," thereby expressly revealing his status as agent. From this signature alone Fernandez should have realized he was dealing with a corporate salesman. Furthermore, the company name was prominently displayed on the right hand corner of the contract.
Assuming no express disclosure took place, the circumstances of the dealings between the parties provided sufficient indicia of Miller's agency status to put Fernandez on notice.
Relative to appellant's second contention, our Supreme Court has said in Hob's Refrigeration & Air Conditioning, Inc. v. Poche, 304 So.2d 326, 327 (La.1974):
"In Louisiana sales, the seller is bound by an implied warranty that the thing sold is free of hidden defects and is reasonably fit for the product's intended use. Civil Code Articles 2475, 2476, 2520; Rey v. Cuccia, 298 So.2d 840 (La. 1974). While this implied warranty against redhibitory defects may be limited by the seller, such a limitation, to be effective, must be clear and unambiguous. Articles 2474, 2503, 2522; Rey v. Cuccia, supra. * * *"
The evidence shows that Miller was unaware of any oil leak until it was discovered by him, Mr. Fernandez and Mr. Cain during the time the men examined the plane after it was brought from Ohio. The leak was noted by plaintiff before the plane was purchased and the pre-purchase examination of the plane was extensive. The price of the plane was substantially reduced when various defects, including the oil leak, became apparent.
Any purported waiver of remedies at law for redhibitory defects is ineffective unless it is expressly and knowingly made. Prince v. Paretti Pontiac Company, Inc., 281 So.2d 112 (La.1973).
The contract provides the plane was sold "As Is," and on the face of the purchase order in large clear print, the Aircraft Purchase order indicates the Warranty and Limitations of Liability are set forth on the reverse side of the form. On the reverse side, in equally large print, those limitations are specifically set forth.
We are of the opinion plaintiff clearly waived any implied warranty. He knew of the oil leak before the plane was purchased.
For the reasons assigned, the judgment appealed from is reversed and it is now ordered that there be judgment in favor of defendants R.E. Miller and Miller Richards Aircraft Sales, Inc., dismissing plaintiff's suit at plaintiff's cost.
REVERSED AND RENDERED.